**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0378n.06
Filed: June 26, 2008

No. 06-6461

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| WILLIAM HENRY HUGHES, | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellee.** | ) | |
| | ) | |

Before:  MOORE, CLAY, and ROGERS, Circuit Judges.

KAREN NELSON MOORE, Circuit Judge.  A jury found Defendant-Appellee Dr. William Henry Hughes ("Hughes") guilty of bank fraud, in violation of 18 U.S.C. § 1344.  On appeal, the government argues that Hughes's sentence, which consisted of one day of imprisonment, five years of supervised release, an assessment of $100, and $100,000 of restitution, is substantively unreasonable because the district judge failed to consider and apply properly the appropriate factors in reaching a term of imprisonment of only one day.  As explained below, we hold that the sentence is substantively unreasonable, we **VACATE** the district court's judgment of sentence, and we **REMAND** for resentencing consistent with this opinion.

**I.  FACTS AND PROCEDURE**

**A.  Factual Background**

This case centers around a physician's cashing of checks intended for, and made out to, a clothing company. Hughes, a practicing urologist in the Hermitage, Tennessee area, routinely had his sole employee retrieve his office mail, including insurance-reimbursement checks. Although the employee retrieved the insurance checks, Hughes usually deposited the checks in the bank himself.

Unbeknownst to the employee responsible for retrieving the mail, Hughes maintained another post-office box in Brentwood, Tennessee. The post-office box located next to Hughes's Brentwood box belonged to "Tom James - Oxxford [sic] Clothes - Individual Apparel Group" ("IAG"); the IAG box received "a considerable number" of checks each day.[1] Joint Appendix ("J.A.") at 79 (Presentence Report ("PSR") at ¶ 8).

The events at issue began on August 30, 1999, when Hughes "deposited 29 separate checks payable to IAG of varying dates up to two months old into his SunTrust account."[2] J.A. at 80 (PSR at ¶ 10). "According to the Government, it is not known how Hughes came into possession of IAG's checks." J.A. at 81 (PSR at ¶ 22). The checks, each of which was from a men's clothing store, totaled $15,452.10. J.A. at 80 (PSR at ¶ 10). "With this deposit, Hughes included one check from himself for $500 that was placed on top of the stack of deposited checks." J.A. at 80 (PSR at ¶ 10). SunTrust accepted Hughes's deposit to his own account notwithstanding that IAG was the named payee. Eventually, IAG discovered that its checks were missing and notified SunTrust; SunTrust traced the checks to Hughes and attempted to contact him. After Hughes failed to return the bank's

---

[1]The facts presented here are largely drawn from the Presentence Report and were not challenged by Hughes or the government.

[2]IAG and Hughes both banked with SunTrust Bank ("SunTrust"), and both used the same branch.

2

calls, SunTrust took money from Hughes's account and paid IAG in November 1999; Hughes did not respond to the removal of the funds from his account.

On October 7, 1999, Hughes deposited another check that was made out to IAG into his SunTrust account; this check represented a payment from Saks Fifth Avenue ("Saks") to IAG in the amount of $155,794.20. Five days later, Hughes transferred $90,000 of the money to a new savings account at SunTrust. In April 2000, Hughes told his accountant that the deposits were contributions to his business (and thus not taxable). In July 2000, the checking account into which the Saks check had been deposited was closed; we cannot ascertain from the record before us (which does not include a trial transcript) who closed the account or why it was closed. By August 2000, Hughes's active checking account at SunTrust contained only $12,064.46. After determining that the Saks check had not been received by IAG but had been deposited into Hughes's checking account, SunTrust put a hold on Hughes's active checking account. Ultimately, SunTrust removed $12,000 from Hughes's checking account in order to reimburse Saks, using the bank's own funds to pay the remainder of the missing money owed. Prior to this time, "Hughes spent the money for his own use and benefit, namely to pay off old debts so he could secure a mortgage loan for his new home." J.A. at 80 (PSR at ¶ 14).

When, in August 2000, a SunTrust investigator approached Hughes about his fraudulent deposits, Hughes first stated that he may not have made the deposit of the Saks check because his office employee performed such duties. However, after the investigator explained that the bank had a surveillance camera picture of Hughes personally making the deposit, Hughes provided a second explanation: he must have mistaken the check for an insurance-reimbursement check as a result of his failing to inspect the check when he deposited it. Eventually, SunTrust sued Hughes for the

3

balance of the funds; he admitted, in a civil deposition in July 2002, to taking the money by mistake and spending it to pay his debts. Hughes agreed to pay restitution to SunTrust.

Hughes's efforts to repay SunTrust, however, included a check that bounced, his failure to inform SunTrust that he had declared bankruptcy, and a counterfeit check. "On October 26, 2002, Hughes gave a $500 check with cash back of $250 and a $250 payment on the debt," but it was returned for insufficient funds. JA. at 81 (PSR at ¶ 18). Hughes then gave SunTrust a promissory note for $125,000 on June 2, 2004, and agreed to pay $12,500 each month for ten months; however, Hughes failed to explain that he had declared bankruptcy on March 31, 2004. In addition, in August 2004, Hughes used computer software, allegedly the Paychex office-payroll software that he used to pay his employee, to create a $10,000 counterfeit check drawn on a nonexistent account at the Northern Trust Bank in Chicago.

Prior to the above events that led to Hughes's conviction for bank fraud, Hughes had no criminal history. He served on active duty in the United States Army from 1980 to 1982 and transferred to the Reserves in 1982, in which he served until 2001. He was reportedly a respected member of his community. Two former patients testified on his behalf at his sentencing hearing. One testified that he had known Hughes for four years, and that Hughes had been a patient doctor who always had time to address his concerns without rushing. J.A. 65-66 (Sent. Hr'g Tr. at 12:19-13:19). Another, who was a former bank president and fellow church member who had known Hughes for sixteen or seventeen years, testified that Hughes was not only a very caring physician but also "the chief architect" of the health program for their church's membership (including a bulletin and seminars). J.A. at 69 (Sent. Hr'g Tr. at 9:10). Also, Hughes's minister, whom he had known for fifteen years, testified on behalf of Hughes at the sentencing: "[Dr. Hughes] serves as our chief

4

advisor to our health commission, which has about 30 healthcare workers who are in control of our health program at the church. In addition to that, he has served—done a lot of workshops and seminars free, especially on prostate for African-American males . . . and he has done all this free, and not only for his church but even for the community." J.A. at 72 (Sent. Hr'g Tr. at 6:2-9).

Hughes estimated the value of his practice to be one million dollars. The majority of Hughes's net worth is the cash value of his life-insurance policy. The most up-to-date information provided in the Presentence Report indicated that Hughes owed approximately $30,000 in over-due payments on his child support obligations.

## B. Procedural Background

A grand jury indicted Hughes on November 30, 2005 for one count of bank fraud in violation of 18 U.S.C. § 1344. Hughes pleaded not guilty and went to trial before a jury. On June 28, 2006, the jury found Hughes guilty. Given his Criminal History Category of I and offense level of 17, the calculated United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range set forth in the PSR was twenty-four to thirty months of imprisonment and three to five years of supervised release. On October 25, 2006, the district court sentenced Hughes to one day of imprisonment, five years of supervised release, an assessment of $100, and $100,000 of restitution to be paid at a minimum monthly rate of ten percent of Hughes's gross monthly income.

## II. SUBSTANTIVE REASONABLENESS REVIEW

### A. Standard of Review

Under *Rita v. United States*, 551 U.S. —, 127 S. Ct. 2456 (2007), and *Gall v. United States*, 552 U.S. —, 128 S. Ct. 586 (2007), we review a district court's sentencing determination for

5

reasonableness "under a deferential abuse-of-discretion standard." *Gall*, 128 S. Ct. at 591; *Rita*, 127 S. Ct. at 2472.

## B. Analysis

*Booker* gave "the district courts discretion in sentencing, in accordance with the § 3553(a) factors, and reasonableness review is the manner in which the courts of appeals review sentences to determine if the sentencing courts abused that discretion." *United States v. Liou*, 491 F.3d 334, 338 (6th Cir. 2007) (citing *Rita*, — U.S. —, 127 S. Ct. at 2465; *United States v. Booker*, 543 U.S. 220, 261-62 (2005)). "A sentence may [be] substantively unreasonable where the district court 'select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors, or giv[es] an unreasonable amount of weight to any pertinent factor.'" *Id.* at 337 (quoting *United States v. Jones*, 489 F.3d 243, 252 (6th Cir. 2007)). We review, pursuant to the abuse-of-discretion standard, the substantive reasonableness of the sentence based on "the totality of the circumstances." *Gall*, 128 S. Ct. at 597.

The Supreme Court in *Gall* foreclosed the type of proportionality review that we once applied to outside-Guidelines sentences. *United States v. Klups*, 514 F.3d 532, 539 (6th Cir. 2008) (quoting *Gall*, 128 S. Ct. at 594). *Gall* "reject[ed] . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range . . . [as well as] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* (quoting *Gall*, 128 S. Ct. at 595). Under *Gall*, we "may not apply a presumption of unreasonableness" to sentences outside of the Guidelines range. *Gall*, 128 S. Ct. at 597. However, a district court must give a "'specific reason'"

6

for imposing an outside-guidelines or variance sentence. *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(c)(2)).

"On abuse of discretion review, [we give] due deference to the [d]istrict [c]ourt's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence."[3] *Gall*, 128 S. Ct. at 602. *Gall* instructs us that a district court has not necessarily committed reversible error by "attach[ing] great weight" to a single factor. *Id.* at 600. In addition, we may not reverse the sentence imposed by the district court simply because we "might reasonably have concluded that a different sentence was appropriate." *Id.* at 597. Finally, as we recently stated, the "central lesson" to be learned from the Supreme Court's recent sentencing decisions is "that district courts have considerable discretion in this area and thus deserve the benefit of the doubt when we review their sentences and the reasons given for them." *Vonner*, 516 F.3d at 392.

The district court here, after reviewing the § 3553(a) factors, imposed a non-Guidelines (or variance) sentence. *United States v. Cousins*, 469 F.3d 572, 577 (6th Cir. 2006) (highlighting the difference between a departure based on Chapter 5 of the Guidelines and a post-*Booker* "non-Guidelines" (or "variance") sentence). As noted above, the district court sentenced Hughes to one day of imprisonment and five years of supervised release,[4] and also required him to pay $100,000

---

[3]"Certainly, in considering the § 3553(a) factors in the course of determining 'that an outside-Guidelines sentence is warranted,' the district judge 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Klups*, 514 F.3d at 539 (quoting *Gall*, 128 S. Ct. at 597). Moreover, we have said that we apply "not just abuse-of-discretion review to the reasonableness of a sentence but abuse-of-discretion review to the district court's determination that there is a legitimate correlation between the size of the variance and the reasons given for it." *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008).

[4]The difference between supervised release and probation should be noted. Supervised release "is an order of supervision in addition to any term of imprisonment imposed by the court."

7

in restitution to SunTrust. The district court found that Hughes "attempted" to reimburse SunTrust for years and had "never been able to dig himself out of his financial difficulties." J.A. at 57 (Sent. Hr'g Tr. at 21:21-23). The district court considered Hughes's contribution, as an African-American urologist, to the African-American males in his community: "The court is very impressed with the fact that Dr. Hughes is apparently, according to everybody who's written to me, the only black urologist in the Nashville area serving an extremely important role in the medical community of Nashville given the high incidence of prostate cancer among African-American males." J.A. at 56 (Sent. Hr'g Tr. at 20:5-11). The district court noted that Hughes served his community "in many, many different ways, providing free screenings, serving on panels, lecturing, [and] serving through his church in this area." J.A. at 56 (Sent. Hr'g Tr. at 20:12-15).

The government argues that several aspects of the district court's sentencing explanation require that we vacate Hughes's sentence and remand for resentencing. With due regard for the deference that we owe to the sentences imposed by district courts post-*Booker* and post-*Gall*, after reviewing the record in detail we conclude that the district court abused its discretion by giving an unreasonable amount of weight to one factor and speculating about irrelevant facts related to the case. This abuse of discretion requires us to vacate Hughes's sentence and remand this case to the district court. We explain the rationale behind our decision below.

---

U.S.S.G. ch. 7, pt. A, introductory cmt. 2(b) (2005) (citing 18 U.S.C. § 3583(a)). Probation is "a sentence in itself." *Id*. at cmt. 2(a) (citing 18 U.S.C. § 3561). Because Hughes's offense required a period of incarceration, the district court changed its original sentence of five years of "probation," J.A. at 58 (Sent. Hr'g Tr. at 22:17), to one day of imprisonment and five years of supervised release.

### 1. Factor Given an Unreasonable Amount of Weight

As explained above, there are two main reasons for vacating Hughes's sentence and remanding the case to the district court. First, we conclude that the district court attached an unreasonable amount of weight to Hughes's attempts to repay SunTrust when evaluating the nature of the offense under § 3553(a)(1), seeking to impose a sentence that would reflect the seriousness of the offense and just punishment under § 3553(a)(2), and seeking to avoid unwarranted sentencing disparities under § 3553(a)(6). J.A. at 57 (Sent. Hr'g Tr. at 21:21-23). The district court concluded: "This is not a normal bank fraud case. This is a situation where Dr. Hughes agreed to pay this money back years ago, attempted to pay it back for years, and just has never been able to dig himself out of his financial difficulties." J.A. at 57 (21:19-23). The district court considered the "embarrassment" and "humiliation" Hughes felt as a result of his prosecution. J.A. at 56 (Sent. Hr'g Tr. at 20:20-21). Also, it considered the fact that Hughes was under "tremendous financial pressure" at the time that he committed bank fraud. J.A. at 57 (Sent. Hr'g Tr. at 21:14). Although Hughes argues that the district court properly considered that he had "failed to make full restitution because he was financially unable to [do] so, not because he intended to avoid his responsibilities," Appellee Br. at 21, the record evidence paints a more complex picture.

Before we address the weight that the district court attached to Hughes's attempts to repay the bank, however, we take a moment to highlight an important point. This case requires us to distinguish between situations in which a district court gives weight to an improper factor, and situations in which a district court examines a relevant factor but, despite rigorous analysis, gives unreasonable weight to that factor by failing to examine the full spectrum of information on the record before it relating to that factor. For example, in *United States v. Malone*, 503 F.3d 481 (6th

9

Cir. 2007), we vacated the defendant's sentence because the district court improperly considered what sentence the defendant might receive in a Michigan state court. *Id*. at 486. The rationale underlying *Malone* can be contrasted with a case such as *United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008). In *Pugh*, the Eleventh Circuit held that the sentence imposed upon the defendant was unreasonable because the district court failed to consider several salient facts elicited during two sentencing hearings, leading the district court to give unreasonable weight to certain relevant factors. *Id*. at 1193-94; *see United States v. Roberson*, 474 F.3d 432, 436 (7th Cir. 2007) (holding that the district court did not weigh the factors in a reasonable manner because it "failed to consider their equivocal character" and failed "to compare them with the aggravating factors").

As we examine whether the district court may have given unreasonable weight to a particular factor relevant to the sentencing determination, we are ever mindful of ensuring that we conduct a review for *reasonableness*, not a review that subtly substitutes our judgment as to the proper weighing of certain factors relevant to sentencing. *Gall* made clear that our review for reasonableness is not a de novo review. *Gall*, 128 S. Ct. at 600. We do not have authority to vacate and remand each time we determine that a district court has not weighed the sentencing considerations just as we might have done. *Id*. at 597. However, despite a district court's extensive, first-hand knowledge of a case gleaned through a trial and/or sentencing hearing and the deference that we are required to give it, there may be occasions, as in *Pugh*, when the "cold" record before us clearly indicates that the district court failed to consider the full spectrum of information relevant to a particular factor in its analysis; such an oversight could produce an unreasonable sentence. Our role is to bring such an oversight to the attention of the district court through our reasonableness

review so that the district court may address it, and make any appropriate adjustments to the sentence on remand.

With the above in mind, we now address the unreasonably great weight that the district court attached to Hughes's attempts to repay SunTrust. The district court justified its determination that this was not a "normal bank fraud case," J.A. at 57 (Sent. Hr'g Tr. at 21:19), by stating that Hughes had "agreed to pay this money back," had "attempted" to do so for years, and had "never been able to dig himself out of his financial difficulties." J.A. at 57 (Sent. Hr'g Tr. at 21:20-23). Although it was appropriate for the district court to consider Hughes's attempts to repay SunTrust as the court analyzed the relevant § 3553(a) factors, our review of the record indicates that the district court did not consider evidence indicating *dishonest* attempts at repayment by Hughes. As described above, the record shows that Hughes sent SunTrust a check that bounced, executed a promissory note and agreed to a payment plan in June 2004 without informing SunTrust that he had declared bankruptcy two months earlier, and used computer software to create a counterfeit check which he tendered to SunTrust. The "totality of the circumstances," *Gall*, 128 S. Ct. at 597, reveals that some of Hughes's attempts to repay SunTrust involved subterfuge and dishonesty; yet, the district court did not indicate that it considered the fraudulent nature of these attempts at repayment when crafting a sentence for Hughes. Therefore, because the record contained evidence of fraudulent actions surrounding Hughes's agreement to repay the money and attempts to repay it, it was unreasonable for the district court to place so much weight in these circumstances on Hughes's attempts to repay the funds.[5] Moreover, because the district court used Hughes's attempts at repayment as the foundation for its

_____

[5]If the district court found these dishonest attempts at repayment to be irrelevant for some reason, the court did not articulate this during sentencing nor was it otherwise apparent from the record.

11

conclusion that this was "not a normal bank fraud case," the district court's conclusion that Hughes's case was unique in comparison to the mine-run of bank fraud cases was also unreasonable. In addition, because we conclude that the district court's rationale for viewing this as a unique bank fraud case is unreasonable, it was unreasonable for the district court to give weight to Hughes's embarrassment and humiliation, given that it did not explain why the embarrassment and financial pressure present in Hughes's case were different from other bank fraud or similar white-collar crime cases (or, indeed, from any criminal case). Finally, to the extent that the district court's decision implicitly concluded that Hughes had accepted responsibility for his actions[6] and taken wholly legitimate steps toward rectifying the situation, such conclusions were also not grounded in record evidence, and therefore were unreasonable.

In sum, by failing to consider all of the facts before it regarding Hughes's attempts to repay SunTrust, the district court placed an unreasonable amount of weight on Hughes's attempts at repayment when analyzing the § 3553(a) factors.

---

[6]Because Hughes did not plead guilty but proceeded to trial, the adjustment for "acceptance of responsibility" under the Guidelines was not available to him. U.S.S.G. § 3E1.1 cmt. n.2 (2005). The district court was, however, entitled to consider his acceptance of responsibility when fashioning a sentence. We note that our reading of the record did not reveal any indication that Hughes accepted responsibility for his actions. Hughes stated during the allocution that he "made a mistake, honest mistake," J.A. at 61 (Sent. Hr'g Tr. at 14:18-19); as reasons for his situation, he cited insurance companies that failed to "pay on time," J.A. at 63 (Sent. Hr'g Tr. at 16:3-4), employees to whom he "didn't pay close enough attention," J.A. at 63 (Sent. Hr'g Tr. at 16:7-8), and his ex-wife, who pursued him for child support payments that he had failed to make, eliminating money available to pay SunTrust. J.A. at 63-64 (Sent. Hr'g Tr. at 16:23-17:2). Hughes's troubling statements implicitly and explicitly place the blame for his criminal actions on others, despite the fact that he stated that he was "not blaming them." J.A. at 63 (Sent. Hr'g Tr. at 16:14).

12

## 2. Speculation

A second aspect of Hughes's sentencing that warrants vacating his sentence involves speculation by the district court. The government argues that the district court speculated during the sentencing about issues such as whether SunTrust would prefer fast repayment over Hughes serving a prison sentence, J.A. 58 (Sent. Hr'g Tr. at 22:5-10), whether SunTrust had somehow initiated prosecution of the case at a time of its choosing, J.A. at 55 (Sent. Hr'g Tr. at 19:16-23), and how Hughes came into possession of the checks involved in the crime. J.A. at 54 (Sent. Hr'g Tr. at 18:19-22). Hughes argues (but does not provide support for the proposition) that the district court was permitted to make "logical inferences" after viewing the evidence during trial. Appellee Br. at 22. We examine each alleged instance of speculation in turn.

First, we conclude that the district court inappropriately speculated about SunTrust's wishes regarding the sentence to be imposed on Hughes. After announcing that it did not think imprisonment was appropriate for Hughes, the district court stated that Hughes would need to begin making restitution payments to SunTrust. The district court concluded: "I feel that that's all the bank really wants anyway." J.A. at 58 (Sent. Hr'g Tr. at 22:5). As the Ninth Circuit recently held, however, district courts may not make "unfounded assumptions" when fashioning a sentence for a defendant. *United States v. Romero*, No. 07-30147, 2008 WL 681911, at *1 (9th Cir. March 11, 2008) (unpublished) (citing *Gall*, 128 S. Ct. at 597) (vacating a sentence in part because the district court speculated about a defendant's statistical likelihood of becoming a recidivist). *Gall* requires that a district court "adequately explain the chosen sentence." *Gall*, 128 S. Ct. at 597. Because the district court's statements imply that it considered what sentence the bank might prefer that it impose and there was no support in the record for the district court's statement that SunTrust would prefer

13

a particular type of sentence, we conclude that the district court engaged in unreasonable speculation.[7]

In addition, we conclude that the district court unreasonably speculated about the government's reasons for prosecuting Hughes. The district court stated during the sentencing hearing:

> [W]hat looks to me happened here is that the bank was perfectly content to not lodge criminal charges against Dr. Hughes or try to get him charged criminally, and it was only when they decided he simply wasn't paying according to his schedule that he—they trotted over to the U.S. Attorney's Office and got Dr. Hughes indicted, not very attractive facts for extracting from Dr. Hughes years in prison.

J.A. at 55 (Sent. Hr'g Tr. at 19:16-23). Speculation regarding aspects of the government's decision to pursue a prosecution, absent evidence indicating that such a decision violated the Constitution, would not be a reasonable factor for the district court to consider when fashioning a sentence. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. LaBonte*, 520 U.S. 751, 761-62 (1997). Because the record implies that the district court may have considered the circumstances surrounding the government's decision to prosecute Hughes when fashioning his sentence, and there is no indication that such prosecution was brought in violation of the Constitution, we conclude that the district court engaged in unreasonable speculation.

Finally, we conclude that the district court's recital of hypotheses regarding how Hughes came into possession of the checks at issue did not render Hughes's sentence unreasonable. During sentencing, the district court stated:

---

[7]Even if there were support in the record that would allow the district court to infer that SunTrust preferred that Hughes receive a sentence that would allow him to earn money to pay his debt as soon as possible (instead of serving a lengthy prison term), the district court did not explain why the particular desires of this victim should affect the legal analysis necessary for sentencing Hughes. *See generally* 18 U.S.C. § 3771 (Crime Victims' Rights Act) (2006).

14

And then the large check, I am still totally puzzled as to how this happened, how this check came into his possession.

I think the government is still puzzled. They had a theory at one point that he reached through his post box and grabbed it out of another box. I guess my own personal favorite theory is there's somebody at the post office involved in this whole situation, which nobody has ever found out about.

But the exact way in which Dr. Hughes came into possession of this check or these earlier checks to me is still very befuddling and very confusing. And the fact remains Dr. Hughes knew that check wasn't his; he deposited that check.

J.A. at 54-55 (Sent. Hr'g Tr. at 18:19-19:7). Despite the district court's interest in how Hughes gained possession of the checks, the record does not indicate that the district court considered its various hypotheses when fashioning Hughes's sentence; indeed, the district court explicitly acknowledged immediately after discussing the hypotheses that it was clear that Hughes knew the checks were not his (i.e. there was no mistake) and that he deposited the checks. J.A. at 55 (Sent. Hr'g Tr. at 19:5-6). Thus, the district court's discussion of how Hughes obtained the checks was merely an extraneous interlude.

In sum, we conclude that the district court unreasonably based Hughes's sentence in part on speculation about SunTrust's wishes regarding the sentence to be imposed on Hughes and the timing of (and reason for) Hughes's prosecution. We conclude that Hughes's sentence should be vacated because of the unreasonable weight placed on Hughes's attempts at repayment and because of the district court's unreasonable speculation regarding SunTrust's wishes and the timing and rationale for Hughes's prosecution.

**3. Consideration of Other Factors**

We now address the district court's discussion of Hughes's efforts as an African-American urologist to aid the community of African-American males regarding urological issues. The district court stated during the sentencing hearing:

15

The court is very impressed with the fact that Dr. Hughes is apparently, according to everybody who's written to me, the only black urologist in the Nashville area serving an extremely important role in the medical community of Nashville given the high incidence of prostate cancer among African-American males.

That is apparently a specialty of his in terms of treatment and in terms of service to the community in many, many different ways, providing free screenings, serving on panels, lecturing, serving through his church in this area.

It appears to the court that Dr. Hughes is performing an extremely important role in the African-American community in the healthcare area.

J.A. at 56 (Sent. Hr'g Tr. at 20:5-18).

The government argues that the district court inappropriately considered Hughes's race when determining his sentence. *See* U.S.S.G. § 5H1.10 (stating that "race, sex, national origin, creed, religion, and socio-economic status" are "not relevant in the determination of a sentence") (initial capitals removed). The government stated in its brief: "While the court was entitled to consider defendant's volunteer work in the community, the defendant's race is an irrelevant and improper factor to consider in the [sic] determining a sentence." Gov't Br. at 16. In response, Hughes argues that the district court did not choose his sentence because he is African-American; on the contrary, Hughes argues that "race was merely incidental" to a description of his community work. Appellee Br. at 13-14.

As with other aspects of judicial decisionmaking, we must consider the appearance created by particular judicial actions. Even in a case in which we had full "'confiden[ce]'" that a district court had not used a defendant's race as a basis for determining the appropriate sentence to impose, *United States v. Kaba*, 480 F.3d 152, 157 (2d Cir. 2007) (quoting *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994)), we must consider the appearance created by the district court's sentence. *Id*. at 156. "Because 'justice must satisfy the appearance of justice,' even the appearance that the

16

sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing.'"

*Id*.

We believe, based on the record before us, that the district court did not consider Hughes's race when fashioning his sentence. In addition, the record does not indicate that a "reasonable observer," *Kaba*, 480 F.3d at 157 (quoting *Leung*, 40 F.3d at 586-87), would have concluded that there was even the appearance that Hughes's race played a role in the district court's sentencing determination. Unlike *Kaba*, the district court in Hughes's case did not suggest that the sentence was based on Hughes's race or national origin, only that it was partly based on his community service. Our review of the record indicates that the district court continually mentioned Hughes's race in conjunction with his community service activities, namely his ability to put other African-American males at ease, which enabled an under-served population in Tennessee to have access to urological consultations essential to prostate health. The district court cited the importance of Hughes's skill-set for the African-American male population. J.A. at 56 (Sent. Hr'g Tr. at 20:5-18). We agree with the district court's assessment that Hughes's civic activities in general are laudable and surely deserve to be considered by the district court, as the government conceded. Because our review of the record indicates that a reasonable observer would not have considered Hughes's race to have played a role in his sentence, we conclude that the district court did not consider race in a manner that warrants vacating Hughes's sentence.

### III. CONCLUSION

We emphasize that although we conclude, based on the record before us, that the district court abused its discretion in imposing a sentence of only one day of incarceration, we do *not* hold that such a sentence is necessarily substantively unreasonable. However, because the district court

placed an unreasonable amount of weight on Hughes's attempts to repay SunTrust, and unreasonably speculated about the timing of the prosecution and SunTrust's desire for the court to impose a particular sentence, we conclude that Hughes's sentence is substantively unreasonable. Therefore, we **VACATE** Hughes's sentence and **REMAND** this case to the district court for resentencing in accordance with our opinion.

ROGERS, concurring. I concur in the majority opinion. I do have a concern that the district court's statements could be read to indicate that the district court impermissibly took race into account in this case. However, the case is being remanded to the district court in any event, and we have read the record to indicate that the district court instead mentioned defendant's race only incidentally in discussing the defendant's efforts to help a medically under-served population in Tennessee. The district court on remand is of course bound to limit its consideration of that factor to the way that we have read it.