**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0177n.06

**No. 09-5259**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Mar 22, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| WILLIAM HENRY HUGHES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: MOORE, CLAY, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. William Hughes was convicted of bank fraud and sentenced to fourteen months' imprisonment. Hughes now appeals, arguing that this sentence is substantively unreasonable. Because Hughes's sentence was not arbitrary or based on impermissible factors, and because the district court considered and balanced reasonably all of the relevant sentencing factors, Hughes's sentence is substantively reasonable.

William Hughes is a urologist practicing in Nashville, Tennessee.[1] Hughes rented a post office box at the Brentwood post office. A clothing company with a neighboring post office box routinely received checks in its box. In August of 1999, Hughes deposited twenty-nine checks totaling $15,452.10 addressed to the clothing company into his bank account. The PSR does not

---

[1]These facts are taken from the Presentence Investigation Report (PSR), to which Hughes did not object.

disclose how Hughes came to possess the checks.  The clothing company notified the bank of the missing checks, and the bank traced the funds to Hughes's account.  After attempts to contact Hughes proved unsuccessful, the bank debited the $15,452.10 from Hughes's account and reimbursed the clothing company in November of 1999.  Hughes did not inquire about the $15,452.10 debit from his account.

In October of 1999, Hughes obtained a check for $155,794.20 addressed to the clothing company and deposited it into his bank account.  In August of 2000, the clothing company and the bank determined that the check had been erroneously deposited into Hughes's bank account.  The bank reimbursed the clothing company for the wrongly deposited check, and the bank was able to debit only $12,000 from Hughes's checking account.  In later discussions with a bank investigator, Hughes initially claimed that one of Hughes's employees had mistakenly deposited the check into Hughes's account.  When told that the bank had surveillance video of him personally depositing the check, Hughes then claimed that he had mistaken the check for an insurance reimbursement check.  Hughes agreed to pay restitution to the bank.  In October of 2002, Hughes paid restitution with a bad check.  In June of 2004, Hughes gave the bank a promissory note for the remainder of the debt without informing the bank that he had just filed for bankruptcy.  In August of 2004, Hughes gave the bank a $10,000 counterfeit check.

A grand jury indicted Hughes for bank fraud in violation of 18 U.S.C. § 1344, and a jury found Hughes guilty.  Hughes's base offense level was seven.  *See* U.S.S.G. § 2B1.1(a) (2005 edition).  Ten points were added because the offense involved a loss greater than $120,000.  *See id.*

§ 2B1.1(b)(1)(F). Based on Hughes's Total Offense Level of seventeen and Criminal History Category of I, Hughes's Guideline range is twenty-four to thirty months' imprisonment.

The district court held a sentencing hearing in October of 2006. Hughes's pastor testified that Hughes was a loyal church member and that Hughes had done workshops and seminars on prostate cancer and other medical issues relevant to African-American males for the church and the community. A national church official testified that Hughes was a loyal member of the church, the chief architect of the church's health program, and a caring physician. Hughes testified that he had never lied, and that he had made his best efforts to repay the funds. He also commented on the reasons for his financial difficulties, including tardy reimbursement by medical insurance companies, his poor supervision of his employees, and his need to pay child support. Hughes also submitted evidence that he served in the army during Desert Storm, and that he was the only African-American urologist in Nashville. The district court noted that Hughes's conviction was a great embarrassment to him and suggested that the conviction might have ramifications for his medical license. The court also commented that this was not a normal bank fraud case in that the bank had only reported the crime when Hughes failed to pay restitution. The district court concluded that one day's imprisonment followed by five years of supervised was a sufficient sentence.

This court reversed that sentence as substantively unreasonable. *United States v. Hughes*, 283 F. App'x 345 (6th Cir. 2008) (unpublished). We concluded that the district court had given Hughes's attempts to repay the bank unreasonable weight, particularly in light of Hughes's tendering of a bad check and a counterfeit check, and his failure to notify the bank of his bankruptcy in the

course of his claimed repayment attempts. *Id.* at 351-53. This court further noted that the United States's motivation for prosecuting the case was speculative. *Id.* at 353-55. We vacated and remanded the case for resentencing. *Id.* at 356.

At his second sentencing hearing in February of 2009, Hughes testified about his military service, his professional background, and his continued medical service after his conviction. Hughes testified that he was the only urologist serving patients from TennCare—Tennessee's version of Medicaid—in the Nashville area. Hughes also acknowledged that he had deposited the clothing company's checks in his account knowing they were not intended for him. The district court varied downward from the Guidelines and sentenced Hughes to fourteen months' imprisonment and three years of supervised release. The court balanced the seriousness of Hughes's offense, as well as Hughes's misconduct during his claimed repayment attempts, against what the court called the "many mitigating factors in the background of Dr. Hughes," including Hughes's military service and his service to under-served medical populations. The district court concluded that these mitigating factors justified a downward variance, but nonetheless imposed a custodial sentence in light of the seriousness of Hughes's offense and the need to avoid unwarranted sentencing disparities. Hughes now appeals, arguing that his sentence is substantively unreasonable.

Hughes's sentence is substantively reasonable. In evaluating substantive reasonableness, "[t]he touchstone for our review is whether the length of the sentence is reasonable in light of the [18 U.S.C.] § 3553(a) factors." *United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the

sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (quoting *United States v. Lapsins*, 570 F.3d 758, 772 (6th Cir. 2009)). In imposing a substantially below-Guideline sentence, the district court carefully considered Hughes's mitigation arguments, considered only permissible factors, and imposed a custodial sentence after explicit reference to factors that justified that sentence under § 3553(a). In light of this, Hughes's sentence is reasonable.

Hughes argues that his sentence is unreasonable because (1) similar evidence was available at both sentencing hearings, such that the greater sentence imposed at the second hearing was unjustified, (2) the district court did not consider a non-custodial sentence, and (3) the district court did not consider the impact of Hughes's incarceration on the population of patients Hughes serves. The first of these arguments fails given this court's conclusion that the sentence imposed at Hughes's first sentencing hearing was substantively unreasonable. The other two arguments are not supported by the record. The district court recognized Hughes's arguments for a non-custodial sentence, but concluded that "there must be the slam of a prison door behind Dr. Hughes in order to serve the other purposes of sentencing and to avoid unwarranted sentencing disparities." The district court stated that a custodial sentence was necessary to serve the § 3553(a) factors despite the court's recognition that "Dr. Hughes is providing very important services to this community and has a very important medical practice that will be missed when he goes off to serve some time." The district court thus

imposed Hughes's sentence after considering the necessity of a custodial sentence under § 3553(a)

and the impact of Hughes's imprisonment on under-served medical patients in Nashville.

For these reasons, we **AFFIRM** the sentence imposed by the district court.