RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　　　　　　　*Plaintiff-Appellee*,

　　*v.*

EDIBERTO AGUILAR-CALVO,

　　　　　　　　　　　　　*Defendant-Appellant*.

No. 19-5278

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:18-cr-00149-1—Eli J. Richardson, District Judge.

Decided and Filed:  December 16, 2019

Before:  NORRIS, MOORE, and DONALD, Circuit Judges.

_____

### COUNSEL

_____

**ON BRIEF:**  Molly Rose Green, R. David Baker, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.  Byron M. Jones, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  Ediberto Aguilar-Calvo pleaded guilty to illegal reentry by a previously deported felon, and the district court sentenced him to thirty-eight months in prison, to run consecutive to an eight-month sentence for a supervised-release violation.  Aguilar-Calvo now appeals this sentence on the ground that it is procedurally

unreasonable. For the reasons set forth in this opinion, we **AFFIRM** the sentence of the district court.

## I. BACKGROUND

On June 20, 2018, Ediberto Aguilar-Calvo was indicted for illegal reentry, in violation of 8 U.S.C. § 1326(a) and (b)(1). R. 1 (Indictment). He had been previously convicted of felony drug possession, assault, driving under the influence, and illegal reentry. R. 38 (Presentence Investigation Report ¶¶ 4–5, 23–27) (Page ID #165, 167–69). On November 19, 2018, Aguilar-Calvo entered a plea of guilty. In its sentencing memorandum, the government addressed the sentencing factors set forth in 18 U.S.C. § 3553(a), and stated the following in connection with the statute's requirement that the district court consider the "seriousness of the offense":

> Many citizens of the United States have grown impatient with their government's seeming inability to deter undocumented immigrants, convicted of felonies in the United States and deported back to their home countries, from returning to the United States illegally. Those of us who are relatively more privileged may welcome the contributions of undocumented immigrants. Our neighbors who are less materially secure, however, who must compete more directly with undocumented immigrants for employment opportunities and social services, are not feeling so generous or welcoming. Those neighbors want our borders secured with physical barriers if our justice system does not suffice to enforce our duly enacted immigration policies. Those neighbors are impatient for action to protect their perceived economic interests, as promised by our duly enacted immigration policies.

R. 24 (Gov't Sent'g Mem. at 3–4) (Page ID #59–60). Aguilar-Calvo's sentencing memorandum argued that the district court should not consider such "extraneous, inflammatory, and idiosyncratic views" in sentencing him. R. 25 (Def. Sent'g Mem. at 3) (Page ID #66). In response to Aguilar-Calvo's sentencing memorandum, the government stated as follows:

> The United States does not agree that these concerns are "extraneous" to the sentencing considerations in this case. These concerns are among the reasons that the advisory sentencing guidelines recommend a higher sentence for recidivist illegal reentries, like Mr. Aguilar-Calvo's. These concerns are among the reasons that the advisory sentencing guidelines recommend a higher sentence for illegal reentries by defendants who have a prior felony conviction for which they were sentenced to serve five years or more, as was Mr. Aguilar-Calvo.

R. 26 (Gov't Response to Def. Sent'g Mem. at 4) (Page ID #82). The district court heard argument on this issue at the sentencing hearing and then sentenced Aguilar-Calvo to thirty-eight months of imprisonment after a lengthy explanation of the basis for its sentence pursuant to 18 U.S.C. § 3553(a). Aguilar-Calvo objected to "any consideration of the Government's arguments about political debate about illegal immigration." R. 40 (Sent'g Hr'g Tr. at 63) (Page ID #244). He timely appealed his sentence.

## II. DISCUSSION

The sole argument Aguilar-Calvo raises on appeal is that the district court committed procedural error in relying on the government's "unfounded assertions" regarding the seriousness of illegal immigration in sentencing him. Appellant Br. at 8, 10. Because Aguilar-Calvo timely objected to the district court's consideration of the government's statements, this review is conducted under an abuse-of-discretion standard. *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010).

A sentencing court commits procedural error by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentencing court commits procedural error in this manner "only if it based the defendant's sentence on . . . erroneous information." *United States v. Adams*, 873 F.3d 512, 518 (6th Cir. 2017). This requires us to "look to the sentencing decision with an eye for whether the information in question appears to have been 'an important factor in determining [the] sentence.'" *United States v. Wilson*, 614 F.3d 219, 224 n.3 (6th Cir. 2010) (quoting *United States v. González–Castillo*, 562 F.3d 80, 81 (1st Cir. 2009)).

Similarly, "we have found reversible error where a district judge relies on a factor that is neither enumerated in nor consistent with the Sentencing Guidelines or 18 U.S.C. § 3553(a)." *United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016). If we conclude that the district court relied on such irrelevant information, "it does not matter that the district court relied on a

number, even a large number, of relevant facts in its sentencing . . . . Thus we would not hesitate to reverse a sentence if a judge relied on numerous relevant facts but also relied, for instance, on the morning's horoscope." *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008). As the morning horoscope example illuminates, the requirement that the defendant be sentenced based on accurate information is "not limited to information solely about the defendant's actions and criminal history." *Adams*, 873 F.3d at 518.

Aguilar-Calvo argues that the sentencing court impermissibly relied upon two categories of statements that were either speculative or erroneous. First, he points to the government's representation that U.S. citizens who are "less materially secure" are "not feeling so generous or welcoming" to undocumented immigrants with whom they compete for jobs and social services, and that these citizens "want our borders secured with physical barriers if our justice system does not suffice to enforce our duly enacted immigration policies." R. 24 (Gov't Sent'g Mem. at 4) (Page ID #60). Aguilar-Calvo argues that the government did not provide "any factual basis for these claims." Appellant Br. at 11. Second, he points to the government's characterization of the Sentencing Guidelines as incorporating these immigration concerns by recommending higher sentences for 1) illegal reentries by defendants who have already illegally reentered at least once before, and 2) illegal reentries by defendants who have a prior felony conviction for which they were sentenced to serve five years or more. R. 26 (Gov't Response to Def. Sent'g Mem. at 4) (Page ID #82). This characterization of the Guidelines is erroneous, Aguilar-Calvo argues, because the Sentencing Commission has made clear that the illegal reentry guideline at issue "address[es] *culpability* . . . not *harm*." Appellant Br. at 12 (emphasis in original).

The government's arguments before the district court were blatantly inappropriate. At least with respect to the first category of statements, the government presented the district court with the supposed view of "many" people without providing a hint of factual or legal support. To be clear, the problem with the government's argument was not that it adverted to public opinion in discussing the seriousness of the offense. After all, the statute setting forth the duties of the United States Sentencing Commission requires the commission, in fashioning the Sentencing Guidelines, to determine "the community view of the gravity of the offense" and "the public concern generated by the offense." 28 U.S.C. § 994(c)(4)–(5). The Senate Judiciary

Committee's report on the legislation creating the Sentencing Commission suggested that the Commission, in adhering to these requirements, take note of the Parole Commission's recent lowering of the guideline parole dates for simple possession of marijuana, in light of changing public opinion on this offense. *See* Continuing Appropriations, 1985 -- Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3220, 3353 (1984). Similarly, district courts may find that, in light of changing public opinion of certain offenses, application of strict Guidelines sentences would not properly reflect the seriousness of the offense under 18 U.S.C. § 3553(a). *See* Memorandum on Sentencing Variance in *U.S. v. Dayi*, 26 Fed. Sent. R. 223, 225, 2014 WL 4745515 (Vera Inst. Just.) (2014) (district court explaining the waning seriousness of violations of federal marijuana laws given widespread enactment of state laws decriminalizing, legalizing, and regulating marijuana, as well as the federal government's policy of non-enforcement).

Here, however, the government believed it sufficient to argue for a lengthy prison term for Aguilar-Calvo based on its unsubstantiated belief that many people want our borders secured with physical barriers because immigrants are competing with them for employment opportunities and social services. Putting aside the possibility that, as an empirical matter, this view of how immigrant labor affects the national economy may be unfounded, there are numerous flaws with this line of reasoning. First, it shoulders Aguilar-Calvo with the blame for a poorly articulated problem that is of little relevance to this case. This is not a case where a defendant's conduct allegedly resulted in tangible harm to identifiable victims, or, even more broadly, to a specified geographic community, such as in *United States v. Robinson*, 892 F.3d 209 (6th Cir. 2018). In *Robinson*, we held that the district court did not abuse its discretion in considering, under the "seriousness" prong of 18 U.S.C. § 3553(a), the risk to which the defendant exposed a young child and two women by keeping fentanyl in his apartment and in their presence, and the harm that opioids, fentanyl, and other drugs caused to local Ohio communities where the defendant was distributing drugs, including the county where his offense occurred. *Id.* at 215–16. Here, in stark contrast, the government identified no victim or community that suffered from the conduct of this defendant; instead, it put him on the hook for a narrow strain of economic anxiety, without substantiating the bases for this purported anxiety in any way. This tenuous connection is similar to the one criticized in *United States v. Figueroa*,

622 F.3d 739 (7th Cir. 2010), involving a defendant of Mexican descent sentenced for distributing cocaine. In vacating the sentence, due in part to the district court's "extraneous and inflammatory comments" about the drug wars and undocumented immigrants, the Seventh Circuit noted that it was "unpersuaded by the government's argument that the discussion of the Mexican drug wars was sufficiently germane to the underlying conduct to support the sentence." *Id.* at 741, 744. Here, the government apparently thought it was appropriate to advocate a lengthy term of imprisonment for Aguilar-Calvo because of the perception that the $10 per hour he earned as a construction worker in Missouri, or the $14 per hour he earned for the same work in Tennessee, could have gone to a hardworking American. *See* R. 5-1 (PSR ¶ 41) (Page ID #171).

This relates to another troubling feature of the government's reasoning. Even if Aguilar-Calvo's illegal reentry were somehow responsible, in part, for a scarcity of jobs and other resources for U.S. citizens, his crime did not contribute to a market for any *criminal* activity. By contrast, criminal defendants convicted of possession of illegal drugs or child pornography are frequently sentenced harshly because they "contribute[] to a growing market" for this contraband. *United States v. Faulkner*, 926 F.3d 266, 272 (6th Cir.), *cert. denied*, No. 19-5877, 2019 WL 5150707 (U.S. Oct. 15, 2019) (addressing child pornography). Although sentencing enhancements in the child pornography context, for example, may be wholly unrelated to "the [Sentencing] Commission's usual statistical methods" for fashioning advisory sentencing guidelines, *United States v. Lynde*, 926 F.3d 275, 280 (6th Cir. 2019), the theory is that longer sentences are justified in this context because an individual defendant's activity helps the market for the unlawful product expand.

There is no corresponding "unlawful product" here. The supposed harm of Aguilar-Calvo's participation in the job market cannot be equated with the harm that a possessor and distributor of fentanyl inflicts through propelling the market for this dangerous, unlawful substance. Indeed, this is not why legislation establishing the crime of illegal reentry was enacted in the first place or why maximum sentences for committing the crime have increased over the years. First established as a felony by the Immigration and Nationality Act of 1952, the crime of illegal reentry has been amended multiple times to increase maximum sentences for

offenders who have previously committed other crimes. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345(a)(2), 102 Stat. 4181, 4471; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XIII, § 130001(b)(1)–(2), 108 Stat. 1796, 2023. The punishment for this crime is in part aimed at preventing and deterring undocumented immigrants from committing further crimes, *see* Zoey T. Jones, *Prescribing Disproportionate Punishment: The Federal Sentencing Guidelines for Illegal Reentry*, 33 CARDOZO L. REV. 1217, 1221–23 (2012) (reviewing legislative history of statutory sentencing range for illegal reentry), but this is entirely different from imposing harsh punishment due to the effect of illegal immigration on the job market. Yet the government presented these concerns to the district court as justification for sentencing Aguilar-Calvo to a lengthy term of imprisonment.

On appeal, the government appears to attempt to distance itself from its improper presentation to the district court, stating that it "did not take a position on which side of the debate was correct." Appellee Br. at 14; *see also* R. 40 (Sent'g Hr'g Tr. at 14) (Page ID #195) (Assistant U.S. Attorney: "[A]ll I've said is there's a national debate."). This strains credulity. If the government had explained that illegal reentry is a serious offense because some U.S. citizens believe that *all* Mexican nationals entering this country are drug-dealers and rapists, we would surely have faulted the government for promoting a baseless theory. The government cannot wash its hands of the unseemly argument included in its sentencing memorandum, reply memorandum, and oral advocacy at the sentencing hearing simply by attributing the argument to "[o]ur neighbors" who are not materially secure. R. 24 (Gov't Sent'g Mem. at 4) (Page ID #60). Indeed, the government encouraged the district court to consider these concerns by arguing that the advisory guidelines take account of them in recommending higher sentences for defendants like Aguilar-Calvo. R. 26 (Gov't Response to Def. Sent'g Mem. at 4) (Page ID #82). The government's sponsorship of these concerns in seeking a lengthy sentence for Aguilar-Calvo strikes this court as unbecoming of the quality of lawyering expected from the United States Attorney's Office.

Despite the government's presentation of these inappropriate arguments, however, the district court explicitly disclaimed reliance on them at the sentencing hearing. It is true that the district court, after summarizing the government's argument, stated, "I think that that argument is

perfectly proper." R. 40 (Sent'g Hr'g Tr. at 7) (Page ID #188). In Aguilar-Calvo's view, this shows that the district court weighed the existence of one political constituency's perspective on illegal reentry as determinative of—or at least relevant to—its seriousness. Yet the portion of the transcript that Aguilar-Calvo cites for his claim that the court was "relying on [the government's claims] to help explain why the crime of illegal entry [sic] was serious" includes no statement indicating reliance. Appellant Br. at 11 (citing R. 40 (Sent'g Hr'g Tr. at 7–8) (Page ID #188–89)). Instead, after hearing the parties' arguments on this issue, the district court stated:

> I'm going to take the [government's] argument as sort of like this: To the extent that some folks in society are not eager for immigration enforcement, that could tend to indicate the offense isn't so serious.
>
> [The Assistant U.S. Attorney] makes the point, which is fair enough, that, well, there's a countervailing constituency, so if the Court were to look to one constituency's views that this is not a serious offense, it's appropriate for the Court just to keep in mind there's another constituency that thinks quite the opposite. So, to me, those things, in a sense, balance each other out.
>
> And so the Court will, you know, acknowledge that there is this political debate that there are people on both sides of it, and sort of neither set of voices will sort of move the needle for the Court on how serious this is.

R. 40 (Sent'g Hr'g Tr. at 15) (Page ID #196). Thus, the closest the district court came to acknowledging the relevance of external opinions about the seriousness of illegal reentry was in a hypothetical sense: "[*I*]f the Court were to look to one constituency's views," the district court posited, the government argued that the court should be mindful of a different constituency's views. R. 40 (Sent'g Hr'g Tr. at 15) (Page ID #196) (emphasis added). This diversity of views itself is what led the district court not to rely on one constituency's perspective when considering the seriousness of illegal reentry: "[N]either set of voices will sort of move the needle for the Court on how serious this is." *Id.* Although the district court described the government's arguments as "perfectly proper" and "fair enough," *id.* at 7, 15, we cannot conclude that it *relied* on these arguments when it said that the views raised by the government would not affect its sentence. Indeed, the district court's subsequent explanation of the seriousness of the offense made no reference to the government's arguments; instead, the court emphasized that "the seriousness of the offense is substantially heightened . . . by the fact that the same conduct had recently landed the Defendant in prison for a 14-month sentence," though the court

acknowledged that criminal-immigration violations were, although "serious matters, not as serious as some offenses." R. 40 (Sent'g Hr'g Tr. at 49) (Page ID #230). Similarly, there is no indication in the record that the district court sentenced Aguilar-Calvo in reliance on the government's representation that the Sentencing Guidelines take into account the purported "concerns" that "many citizens" have about illegal immigration. R. 26 (Gov't Response to Def. Sent'g Mem. at 3–4) (Page ID #81–82). Thus, at no point in sentencing Aguilar-Calvo did the district court rely on the government's inappropriate representations.

Comparison with other cases we have decided involving a district court's reliance on speculative or erroneous information at sentencing confirms this conclusion. In *United States v. Hughes*, we vacated a district court's sentence after concluding that it "inappropriately speculated" both about the victim's wishes to be compensated and about the government's reasons for prosecuting the defendant. 283 F. App'x 345, 353–55 (6th Cir. 2008) ("After announcing that it did not think imprisonment was appropriate for Hughes, the district court stated that Hughes would need to begin making restitution payments to SunTrust. The district court concluded: 'I feel that that's all the bank really wants anyway.'"). And in *United States v. Adams*, we vacated a district court's sentence for a defendant's supervised-release violation when the district court based its eighteen-month sentence in part on the "unsubstantiated assertion" by the government that "the brain of an addicted person requires at least eighteen months without abusing drugs to 'reset.'" 873 F.3d 512, 519 (6th Cir. 2017) ("The district court then explained—in response to Adams's question about the length of the period of incarceration—that it had chosen that length 'because you need that long to *reset* and maybe get another, maybe get another chance at remaining clean and sober.'"). There is simply nothing in the transcript of the sentencing hearing in this case that manifests a similar reliance on unreasonable speculation or erroneous information. The district court therefore did not commit procedural error in sentencing Aguilar-Calvo.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Aguilar-Calvo's sentence.