RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

     *v.*

No. 16-6668

FAHD SALEH ALBAADANI,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:16-cr-00065-1—Curtis L. Collier, Chief District Judge.

Decided and Filed: July 13, 2017

Before: DAUGHTREY, MOORE, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Laura E. Davis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Jay Woods, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court in which DAUGHTREY, J., joined. KETHLEDGE, J. (pp. 15–16), delivered a separate dissenting opinion.

_____

### OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Fahd Saleh Albaadani, who was born in Yemen, was sentenced to nine months of imprisonment and one year of supervised release for tampering with a GPS ankle monitor in violation of 18 U.S.C. § 1361 and

8 U.S.C. § 1253(b).  R. 65 (Judgment at 1–3) (Page ID #763–65).  Albaadani has appealed, arguing that his sentence was "based . . . on the impermissible factors of Mr. Albaadani's gender and national origin."  Appellant's Br. at 20.  Although we agree that some of the district court's comments, taken out of context, could appear to be influenced by Albaadani's national origin, the district court's explicit and complete reliance on several serious threats and photographs attributed to Albaadani gives us confidence that the sentence, viewed as a whole, did not create the appearance of having been based on gender or national origin.  Therefore, we **AFFIRM** Albaadani's sentence.

## I.  BACKGROUND

Albaadani came to the United States via Saudi Arabia when he was seventeen years old. R. 53 (PSR ¶¶ 39, 41) (Page ID #683).[1]  On June 26, 2015, an order of removal was issued against him because his former wife ceased to sponsor his request to be a citizen.  R. 55 (Gov't's Sentencing Mem. at 1) (Page ID #689); R. 71 (Trial Tr. at 78–82) (Page ID #867–71).  In fact, Albaadani wants to return to his birthplace, but because Yemen was in a state of "war and political conflict," no travel documents have been issued.  R. 53 (PSR ¶¶ 5, 41) (Page ID #679, 684).  Unable to return to Yemen, but with an order of removal issued against him, Albaadani was detained for "approximately six months," R. 71 (Trial Tr. at 20, 126) (Page ID #809, 915), after which he was released subject to monitoring with a GPS ankle monitor, R. 53 (PSR ¶ 5) (Page ID #679).  Following a period of time living in San Francisco, California, Albaadani was approved for relocation to Chattanooga, Tennessee on March 15, 2016.  *Id.* ¶ 6 (Page ID #679).

Around the time when Albaadani relocated, the Immigration and Naturalization Service received a tamper alert on Albaadani's ankle monitor.  *Id.*  Christopher Purdy, an enforcement and removal officer ("ERO"),[2] followed up on this alert by calling Albaadani.  *Id.* ¶ 7 (Page ID

---

[1]The parties did not object to the presentence report and the district court adopted it without change.  R. 66 (Statement of Reasons at 1) (Page ID #769); R. 72 (Sentencing Tr. at 5) (Page ID #957).

[2]Among other duties, EROs are "in charge of people that have been released on an order of supervision for humanitarian reasons or . . . can't get a travel document."  R. 71 (Trial Tr. at 6) (Page ID #795).  EROs then "monitor [these people's] cases and make sure that . . . everything's fine with them."  *Id.*; *see also Enforcement and Removal Operations*, ICE, https://www.ice.gov/ero (last visited July 5, 2017) (stating that Enforcement and Removal Operations "transports removable aliens from point to point, manages aliens in custody or in an alternative

#679); R. 71 (Trial Tr. at 24, 95) (Page ID #813, 884). Purdy instructed Albaadani to report to an Enforcement and Removal Operations office in Gadsden, Alabama, R. 71 (Trial Tr. at 24, 96) (Page ID #813, 885), which is approximately ninety miles south of Chattanooga, *see* Google Maps, https://www.google.com/maps/ (last visited June 28, 2017). Albaadani refused. Purdy claims that Albaadani "became increasingly verbally aggressive towards [Purdy]," told Purdy to "fuck off," and said that he would "[k]ick [Purdy's] ass." R. 71 (Trial Tr. at 27–28) (Page ID #816–17). Albaadani denied that he was frustrated on the call. *Id.* at 98 (Page ID #887). He also denied making any of the statements that Purdy attributed to him, claiming that he did not recognize the caller and made only one statement: "[N]ext week from now I have to see my deportation officer . . . and I have to discuss this problem with him. . . . If he gives me [an] order to go to Nashville, I will go to Nashville. . . . If I have to go to Nashville every two weeks, I'm going to have to go back to California." *Id.* at 97–98 (Page ID #886–87). On May 9, 2016, Albaadani was arrested and detained once more. R. 53 (PSR ¶ 7) (Page ID #679).

A grand jury charged Albaadani with threatening a federal official in violation of 18 U.S.C. § 115 (Count One), willfully injuring and committing a depredation against federal government property (i.e., the ankle monitor) in violation of 18 U.S.C. § 1361 (Count Two), failing to comply with the terms of release under supervision in violation of 8 U.S.C. § 1253(b) (Count Three), and transmitting a threat in interstate commerce in violation of 18 U.S.C. § 875(c) (Count Four). R. 25 (2d Superseding Indictment) (Page ID #159–63). At trial, Albaadani admitted that he took off the ankle monitor, R. 71 (Trial Tr. at 94–95, 110) (Page ID #883–84, 899), which Purdy estimated would cost under $10 to repair, *id.* at 11–12 (Page ID #800–01).

With respect to Counts One and Four, the government argued that there were several instances in which Albaadani made threats to federal officers and others. First, there was the aforementioned phone call with Officer Purdy. The government also pointed to another incident, in which Albaadani allegedly said "I don't fuck with guns. I fuck with bombs" at an Intensive Supervision Appearance Program ("ISAP") office in San Francisco. *Id.* at 101–02 (Page ID

---

to detention program, provides access to legal resources and representatives of advocacy groups and removes individuals from the United States who have been ordered to be deported").

#890–91).  Albaadani denied making this statement.  *Id.* at 102 (Page ID #891).  In another instance, Albaadani left a voicemail with an employee at a car dealership, in which Albaadani said, "I will kill somebody" and "mother fucker."  *Id.* at 129–35 (Page ID #918–24).  Albaadani acknowledged that he left the voicemail, *id.* at 135 (Page ID #924), but he explained that he left it out of frustration because he believed that the FBI hacked into his car, causing him to lose control and nearly crash into an 18-wheeler.  *Id.* at 134 (Page ID #923).

The jury ultimately convicted Albaadani of Counts Two and Three.  R. 49 (Verdict Form) (Page ID #643).  He was acquitted of Counts One and Four, regarding threatening a federal officer.

Albaadani's guideline imprisonment range was zero to six months.  R. 53 (PSR ¶ 49) (Page ID #684).  Prior to sentencing, the government filed a motion for upward departure, pointing to Albaadani's history of making threats and his inability to make "himself . . . amenable to supervision."  R. 55 (Gov't's Sentencing Mem. at 7) (Page ID #695).  It requested that the district court sentence Albaadani to the statutory maximum of twenty-four months of imprisonment.  *Id.* at 7, 9 (Page ID #695, 697).  In support, the government elaborated on the incident between Albaadani and ERO personnel in San Francisco using "[t]he defendant's statements to ERO personnel [that] were captured in a database."  *Id.* at 2 (Page ID #690).  According to the database entry, Albaadani told an officer that "[h]e doesn't f**k with guns, but he f**ks with bombs."  *Id.*  The entry also stated that "[n]o significant security concern has been identified at this time."  *Id.* at 2–3 (Page ID #690–91).

The government noted another incident at the same office several months later.  The database entry for that incident states that Albaadani "reported to the ISAP office to follow up on a tracker strap tamper alert that occurred on 2/19/16."  *Id.* at 3 (Page ID #691).  The entry continued, "The participant was overly rude to all Case Specialist[s] when he arrived, complaining . . . that he had been waiting 20 minutes to be seen."  *Id.*  The entry indicated that Albaadani ultimately "stormed out of the office," stating along the way, "I do not care no more, I know what you guys do, you think you are ICE, but me and my friend are ISIS."  *Id.*

In addition to the reported confrontations between Albaadani and law enforcement, the government elaborated on the incident with the car dealership. The government claimed that after leaving the aforementioned voicemail, Albaadani "returned to the car dealership and confronted the employee directly[,] stat[ing] that the employee had 'made [him] late for a $120,000.00 drug deal' and that the defendant was going to make sure someone came to kill the employee." *Id.* at 4 (Page ID #692).

Finally, the government pointed to several photos on Albaadani's Facebook page depicting Albaadani holding various firearms. *Id.* at 5–6 (Page ID #693–94). Two photos include the caption, "Just to keep the game going." R. 55 (Gov't's Sentencing Mem. at 6–7) (Page ID #694–95). One photo of Albaadani without a gun includes the caption, "This is the new word. Find them kill em All. Only bitches hiding behind doors." *Id.* The government claimed that it "does not know the location where the pictures were taken" and that they "were captured from an FBI report of investigation." *Id.* at 6 (Page ID #694). The government provided no further information about this investigation.

At Albaadani's sentencing hearing, the district court engaged in a colloquy with government counsel regarding Albaadani's threat to the public. In response to the government's motion for an upward departure, the district court asked, "We should just keep [Albaadani] in jail forever, shouldn't we?" R. 72 (Sentencing Tr. at 8) (Page ID #960). The court elaborated: "[Albaadani] is not a citizen of the United States. He is a citizen of another country, so there is no allegiance to this country." *Id.* Counsel for the government pointed out that "[t]he Supreme Court has ruled that we cannot . . . detain him forever," to which the district court responded, "So the only way to be sure probably would be to detain him. Since we can't do that, we're going to have an imperfect solution." *Id.*

Determining that it could not detain Albaadani indefinitely, the district court concluded, "And that means that at some point [Albaadani] is going to subject the rest of the American public to danger." *Id.* at 8–9 (Page ID #960–61). Government counsel agreed: "One of my favorite punch lines is that I'll run off that bridge when I get to it. I have no other option but to seek a statutory maximum sentence in this case." *Id.* at 9 (Page ID #961).

Defense counsel was then given an opportunity to speak. She observed that Albaadani "is in the unfortunate position of being from Yemen" and that the Federal Bureau of Investigation had "at least twice" investigated Albaadani for comments "regarding ISIS," but that Albaadani "has not been found to have any alliance with ISIS." R. 72 (Sentencing Tr. at 19) (Page ID #971). The district court responded, "That does indicate, though, either some immaturity or some failure to appreciate the actions of others to his remarks, doesn't it?" *Id.* Defense counsel responded that there was no evidence of Albaadani's danger based on his "background," to which the district court responded, "Well, I think the problem is we have someone who should not be in the United States who is in the United States." *Id.* at 22 (Page ID #974). The court elaborated: "We . . . have an immature young man who has made statements to people that ought to provoke concerning fear on the part of the recipients and was posed with guns in a manner that shows more than someone who is a collector or wants to go hunting or something." *Id.* at 23 (Page ID #975).

The parties then discussed Albaadani's age. Government counsel observed that "there is some debate about whether [Albaadani's] actual age" is twenty-four, *id.* at 25 (Page ID #977) as Albaadani claims, R. 53 (PSR ¶ 39) (Page ID #683). Government counsel continued, "This is also part of the problem going back to [Albaadani's] immigration to the United States. It's very murky how he got here." R. 72 (Sentencing Tr. at 25) (Page ID #977). The court summarized, "I guess what you're saying is that the government is not sure who he is." *Id.* at 26 (Page ID #978). Government counsel responded, "I couldn't agree more, Judge. . . . [T]he PSR does a good job in setting forth the journey that he made from Yemen through Saudi Arabia through here. But I don't doubt that we know very little about who Mr. Albaadani truly is, including his date of birth." *Id.* Government counsel continued, referencing Albaadani's maturity: "One certainly knows not to call people and threaten them or tell people who are working at an office building in San Francisco that I don't mess with guns, I mess with bombs, or . . . [m]e and my friends are ISIS." *Id.*

The district court concluded the hearing by granting the government's motion for an upward departure. *Id.* at 33 (Page ID #985). However, rather than sentence Albaadani to twenty-four months of imprisonment, as the government requested, the court sentenced

Albaadani to nine months of imprisonment and one year of supervised release. *Id.* The district court explained that a twenty-four month sentence would not "be of any practical utility," instead reasoning that nine months would "kick the defendant in the pants to wake him up, to provide some corrective action, and to demonstrate to him that his deeds were, in fact, a big deal and he should not engage in any in the future." *Id.* Among these "deeds," the district court cited the photos attached to the government's "quite detailed memorandum" of Albaadani holding firearms, including what the district court perceived to be an assault weapon, a hunting rifle, a revolver, a semiautomatic pistol, and an indistinguishable weapon. *Id.* at 30 (Page ID #982). The court also noted the "unusual problem" of Albaadani's simultaneous order of removal and inability to return to Yemen. *Id.* at 30–31 (Page ID #982–83).

The court then considered the "3553 factor" of "protection of the public," presumably invoking 18 U.S.C. § 3553(a)(2)(C), which instructs sentencing courts to "consider . . . the need for the sentence imposed . . . to protect the public from further crimes of the defendant." *See* R. 72 (Sentencing Tr. at 31) (Page ID #983). Acknowledging that Albaadani "has never acted [on or] carried out" the threats referenced earlier in the sentencing hearing and that "there is no history of [Albaadani] committing violence in the United States," the district court nevertheless noted that Albaadani "has . . . made a number of threats to various people. And these threats were of the nature that they should cause some concern [among] the recipients of those remarks." *Id.* at 31–32 (Page ID #983–84). In discussing these threats, the district court also observed "that we really do not know who the defendant is" because his birthdate and name are indeterminate. *Id.* at 31 (Page ID #983). The court concluded, "it's possible we have a person standing before us that has a history of which we are unaware, of a history that includes violence. And we have no way of knowing." *Id.*

Finally, the district court took into account Albaadani's reluctance to appreciate the significance of removing his ankle monitor. The district court explained, "The failure to obey the orders of the agency that's charged with monitoring the person in the United States is a big deal. And a person who is in the United States in violation of the law has an obligation to obey any and all the rules, whether they like those rules or not." *Id.* at 32 (Page ID #984).

After the announcement of Albaadani's sentence, defense counsel requested "not having a term of supervised release," but stated that "in other regards, we don't have objections." *Id.* at 36 (Page ID #988). However, the district court did not change Albaadani's term of supervised release. Albaadani filed a timely notice of appeal on November 14, 2016. R. 68 (Notice of Appeal) (Page ID #774). Records published by the Federal Bureau of Prisons indicate that Albaadani was released on February 7, 2017. *See Inmate Locator*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited July 5, 2017).

## II. DISCUSSION

There are two issues on appeal: First, the government argues that the appeal is moot because Albaadani is no longer imprisoned. Second, Albaadani argues that his sentence was unreasonable because the district court impermissibly considered his national origin and gender in its sentence. Because "[a] federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue," *United States v. Solano-Rosales*, 781 F.3d 345, 355 (6th Cir. 2015) (quoting *United States v. City of Detroit*, 401 F.3d 448, 450 (6th Cir. 2005)), we address the government's mootness argument first. We hold that the appeal is not moot and that the district court did not rely on Albaadani's gender or national origin in issuing its sentence.

### A. Mootness

"It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (per curiam) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). In the criminal context, this means that the "[d]efendant must have, and continue to have throughout the litigation, 'an actual injury traceable to the [government] and likely to be redressed by a favorable judicial decision.'" *Solano-Rosales*, 781 F.3d at 355 (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

"Where a criminal defendant challenges a completed custodial portion of his or her sentence while serving a subsequent term of supervised release, this Court has held that the appeal is not moot 'so long as the appeal potentially implicates the length of the appellant's

supervised release term.'" *Id.* (quoting *United States v. Maken*, 510 F.3d 654, 656 n.3 (6th Cir. 2007)). "In practice, this means that a completed custodial sentence may be appealed so long as the district court would retain the discretion to reduce the sentence of supervised release on remand." *Id.* (quoting *United States v. Genschow*, 645 F.3d 803, 813 (6th Cir. 2011); *United States v. May*, 568 F.3d 597, 602 (6th Cir. 2009); *United States v. Bravo*, 362 F. App'x 456, 459 (6th Cir. 2010)). Because there is no minimum term of supervised release in this case, R. 53 (PSR ¶¶ 51–53) (Page ID #685) (citing 18 U.S.C. § 3583(b)(3); U.S. Sentencing Guidelines Manual § 5D1.2(a)(3) (U.S. Sentencing Comm'n 2016)), the district court would have discretion to reduce or eliminate Albaadani's term of supervised release upon a remand. Therefore, Albaadani's appeal is not moot.

The dissent argues that the mootness standard articulated in *Solano-Rosales* has changed following the Supreme Court's decision in *Juvenile Male*. However, *Juvenile Male* does not implicate cases, such as here, in which the sentence has not yet expired. *See* 564 U.S. at 936. Rather, the *Juvenile Male* case was moot because the respondent "was no longer subject to the sex-offender registration conditions that he sought to challenge on appeal" and because he could not show that an "order would likely redress some collateral consequence of the registration conditions." *Id.* at 937. Just the opposite is true in this case: Albaadani is still serving his term of supervised release, which was imposed in the judgment that he appeals. R. 65 (Judgment at 3) (Page ID #765); R. 68 (Notice of Appeal) (Page ID #774). *Juvenile Male* is therefore inapposite. We now turn to the merits of Albaadani's appeal.

## B. Reasonableness of Albaadani's Sentence

Albaadani argues that it was an abuse of discretion for the district court to consider his gender and national origin when imposing its sentence. The government argues that the district court did not consider these factors, and that at any rate, Albaadani "has waived any challenge to[] the procedural reasonableness of his sentence" because he did not raise such a challenge in his opening brief, Appellee's Br. at 8 n.2. We hold that Albaadani has not waived his procedural-reasonableness argument and that "the record does not indicate that a 'reasonable observer' would have concluded that there was even the appearance that [Albaadani's national origin or gender] played a role in the district court's sentencing determination." *See United*

*States v. Hughes*, 283 F. App'x 345, 355 (6th Cir. 2008) (quoting *United States v. Kaba*, 480 F.3d 152, 157 (2d Cir. 2007)).

### 1. Waiver and Forfeiture

As a preliminary matter, we hold that Albaadani has not waived the procedural-reasonableness issue because there is no "*intentional* relinquishment or abandonment of a known right," *see United States v. Olano*, 507 U.S. 725, 733 (1993) (emphasis added) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); nothing in the record indicates that Albaadani *intended* to relinquish the argument that his sentence was procedurally unreasonable.

To the extent that the government argues that Albaadani *forfeited* the procedural-reasonableness issue, it is also incorrect. Albaadani discusses, at a minimum, the standard of review for procedural and substantive reasonableness. *See* Appellant's Br. at 21. Furthermore, a section of Albaadani's brief entitled, "***Mr. Albaadani's 'unique situation' and unreasonable sentence***," argues that the district court impermissibly considered his national origin at sentencing. *See* Appellant's Br. at 24–31. We are satisfied that this explicit and implicit reference to procedural reasonableness is "the timely assertion of a right" such that Albaadani has not forfeited his argument that his sentence was procedurally unreasonable. *See Olano*, 507 U.S. at 733.

### 2. Standard of Review

"We review a district court's sentencing determination 'under a deferential abuse-of-discretion standard,' for reasonableness." *Solano-Rosales*, 781 F.3d at 351 (quoting *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007)). Two components of reasonableness—procedural and substantive—comprise this review, and characterizing an appeal under one heading or the other can affect our standard of review. *See id.*

The core of Albaadani's appeal is his argument that "[t]he district court necessarily abused its discretion when it based its sentence on the impermissible factors of Mr. Albaadani's gender and national origin." Appellant's Br. at 20. However, he does not specify whether he challenges the procedural or substantive reasonableness of his sentence. In addition, "[w]hether

consideration of an impermissible factor is categorized under the procedural or substantive reasonableness prong is not fully settled within our Circuit." *United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016) (quoting *United States v. Espericueta–Perez*, 528 F. App'x 572, 578 n.5 (6th Cir. 2013)). Nevertheless, this lack of clarity does not affect our standard of review with respect to Albaadani's argument that the district court impermissibly took his gender and national origin into account: "Whether a district court improperly considers a defendant's national origin is a question of law, and thus this aspect of a sentencing is reviewed *de novo*." *United States v. Carreto*, 583 F.3d 152, 159 (2d Cir. 2009). And because gender is also an irrelevant factor at sentencing, *see United States v. Sufi*, 456 F. App'x 524, 530 (6th Cir. 2012) (citing U.S. Sentencing Guidelines Manual § 5H1.10), we review de novo whether a district court improperly considered a defendant's gender.

### 3. Consideration of National Origin or Gender

"A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." *Kaba*, 480 F.3d at 156 (quoting *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994)); *Sufi*, 456 F. App'x at 530; U.S. Sentencing Guidelines Manual § 5H1.10 (stating that certain factors, including national origin, "are not relevant in the determination of a sentence"). Thus, "although '[r]eference to national origin and naturalized status is permissible' during sentencing, it is allowed only 'so long as it does not become the basis for determining the sentence.'" *Kaba*, 480 F.3d at 156 (quoting *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994)).

Proof of actual bias is, of course, sufficient to vacate a sentence. However, such proof is not necessary: "Because 'justice must satisfy the appearance of justice,' even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing." *Hughes*, 283 F. App'x at 355 (quoting *Kaba*, 480 F.3d at 156). This is so "[e]ven in a case in which we [have] full 'confiden[ce]' that a district court had not used a defendant's [national origin or gender] as a basis for determining the appropriate sentence to impose." *Id.* (quoting *Kaba*, 480 F.3d at 157).

When the record is viewed in its entirety, a reasonable observer would not conclude that Albaadani's national origin affected his sentence. In explaining its sentence, the district court indicated that it was relying on the photographs of Albaadani holding firearms, the threats he made to various individuals, and his failure to appreciate the significance of removing his ankle monitor. *See* R. 72 (Sentencing Tr. at 29–32) (Page ID #981–84). Albaadani argues that the threats and photographs were viewed through the lens of his national origin—that "[t]he only difference in the 'danger' presented by Mr. Albaadani's occasional outburst[s] and those made by any other defendant prosecuted in East Tennessee is his gender and national origin" and "[t]he only difference between the pictures of Mr. Albaadani holding firearms and those shared above are his gender and national origin." Appellant's Br. at 26–27. However, Albaadani understates the magnitude of these threats and photographs, irrespective of his gender or national origin.

The threats that the government attributes to Albaadani are serious and do not appear to invoke his gender or national origin. At trial, Purdy testified that Albaadani "became increasingly verbally aggressive" during their phone conversation, and that Albaadani told Purdy to "fuck off" and said that he would "kick [Purdy's] ass." R. 71 (Trial Tr. at 27–28) (Page ID #816–17). On another occasion, Albaadani allegedly told an ERO at an ISAP office "that 'He doesn't f**k with guns, but he f**ks with bombs.'" R. 55 (Gov't's Sentencing Mem. at 2) (Page ID #690). Several months later, Albaadani allegedly said at the same ISAP office, "I do not care no more, I know what you guys do, you think you are ICE, but me and my friend are ISIS." *Id.* at 3 (Page ID #691). Finally, at trial, the government played a voicemail that Albaadani left at a car dealership, in which he stated, "I will kill somebody" and "mother fucker." R. 71 (Trial Tr. at 129–35) (Page ID #918–24). The government later explained in its sentencing memorandum that Albaadani "returned to the car dealership and confronted the employee directly[,] stat[ing] that the employee had 'made [him] late for a $120,000.00 drug deal' and that the defendant was going to make sure someone came to kill the employee." R. 55 (Gov't's Sentencing Mem. at 4) (Page ID #692). The district court's conclusion that "these threats were of a nature that they should cause some concern[ among] the recipients of those remarks," R. 72 (Sentencing Tr. at 31–32) (Page ID #983–84), simply does not implicate Albaadani's gender or national origin. Suggesting membership in ISIS and threatening to use bombs in a government building is not an

insignificant outburst, and it certainly distinguishes Albaadani from other defendants by factors other than gender or national origin.

Second, the photographs attached to the government's sentencing memorandum plainly evidence a danger that distinguishes Albaadani from innocent photographs of people holding guns. The captions of two photographs of Albaadani holding guns state, "Just to keep the game going." R. 55 (Gov't's Sentencing Mem. at 6–7) (Page ID #694–95). The caption of another photograph of Albaadani, this time without a gun, states, "This is the new word. Find them kill em All. Only bitches hiding behind doors." *Id.* And, as the district court noted, the photographs depict Albaadani holding a variety of firearms, including an assault weapon, a hunting rifle, a revolver, a semiautomatic pistol, and an indistinguishable weapon. R. 72 (Sentencing Tr. at 30) (Page ID #982). Given the threatening nature of the photographs' captions and the variety of firearms in Albaadani's possession, a reasonable observer would not conclude that the district court's reference to them implicated Albaadani's gender or national origin.

This is not to say that there was no hint of innuendo at Albaadani's sentencing. The district court made several comments in its colloquy with government and defense counsel that might raise the eyebrows of a reasonable observer. At the very beginning of its discussion of the government's motion for an upward departure, the district court asked whether "[w]e should just keep [Albaadani] in jail forever, shouldn't we," adding, "He is not a citizen of the United States. He is a citizen of another country, so there is no allegiance to this country." *Id.* at 8 (Page ID #960). After government counsel acknowledged that indefinite detention was unlawful, the district court stated, "So the only way to be sure probably would be to detain him. Since we can't do that, we're going to have an imperfect solution." *Id.* The court continued, "And that means that at some point he is going to subject the rest of the American public to danger." *Id.* at 8–9 (Page ID #961). Later in the hearing, the district court echoed its concern in response to defense counsel's argument that Albaadani is not a danger to the public, the court stated, "Well, I think the problem is we have someone who should not be in the United States who is in the United States." *Id.* at 22 (Page ID #974).

These comments, which appear to have positioned Albaadani's citizenship status first and foremost at the sentencing hearing, complicate this case. In an era in which Arabs and Muslims

are all too frequently viewed with suspicion and fear, *see generally* Edward W. Said, *Orientalism* (1978), such a focus on Albaadani's citizenship status could cast a shadow over all that follows. So shaded, statements such as "We . . . have an immature young man who . . . was posed with guns in a manner that shows more than someone who is a collector or wants to go hunting or something," *id.* at 23 (Page ID #975), and "it's possible we have a person standing before us that has a history of which we are unaware, of a history that includes violence," *id.* at 31 (Page ID #983), could take on a different, questionable form. Some observers might ask whether such a statement would be made were Albaadani from Ireland rather than Yemen. Moreover, we appreciate Albaadani's "frustration and isolation" that follows from being "stuck in a country that [he believes] does not want him." Appellant's Br. at 26. However, this understandable frustration, even coupled with the district court's initial focus on Albaadani's citizenship status, does not diminish the seriousness of the threats and photographs upon which the district court explicitly relied in determining its sentence, *see id.* at 29–32 (Page ID #981–84). Because these serious threats and photographs distinguish the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), without regard to Albaadani's gender or national origin, and because the district court's explanation of its sentence does not invoke Albaadani's gender or national origin, these irrelevant and impermissible factors did not appear to play a role in Albaadani's sentence.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Albaadani's sentence.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting. Generally, if a defendant does not challenge the validity of his conviction but rather challenges only his sentence or some portion of it, his appeal is moot once the challenged portion of the sentence has expired. *See United States v. Juvenile Male*, 564 U.S. 932, 936 (2011). The exception is where the challenged portion of the sentence (say, his term of imprisonment) has "ongoing collateral consequence[s]" for the defendant even after that portion expires. *Id.* (internal citation and quotation marks omitted). But we do not presume that an expired portion of a defendant's sentence has such ongoing effect. *Id.* Instead, the defendant must show affirmatively that the expired sentence has "some ongoing 'collateral consequence'" that is both "'traceable' to the challenged portion of the sentence and 'likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

Albaadani has not shown any of that here. He challenges only his term of imprisonment, which has expired. But he asserts that his now-expired term of imprisonment potentially does have ongoing consequences, because he will be on supervised release for a year, and if he violates the terms of his release, the district court allegedly might sentence him more harshly because of his Yemeni nationality. Even if one accepts that assertion on its terms, however, that harm is "too speculative—'a possibility rather than a certainty or even a probability'—to keep [Albaadani's] controversy alive." *See Witzke v. Brewer*, 849 F.3d 338, 342 (6th Cir. 2017) (quoting *Spencer*, 523 U.S. at 14). Of course, if the district court had based the length of Albaadani's supervised-release term in part on the length of his (now-expired) prison term, the length of his supervised-release term could be a consequence of the length of his prison term. *See Juvenile Male*, 564 U.S. at 936. But there is nothing in the record to suggest any such connection here. Nor is there anything to suggest that the district court would "likely" reduce Albaadani's supervised-release term if we upheld his challenge to his prison term. His appeal is therefore moot.

In holding otherwise, the Majority relies upon the mootness standard from our decision in *Solano-Rosales*, 781 F.3d 345 (6th Cir. 2015). But that standard is inconsistent with the Supreme Court's mootness standard in *Juvenile Male*. And the holding of *Juvenile Male*, by its terms, applies not only in cases where the defendant's term of supervised release has expired (as happened to be the fact there), but in any "criminal case[]" in which the defendant seeks to continue his appeal after "the challenged portion of [his] sentence" has expired. 564 U.S. at 936. This is such a case, and that holding therefore applies here.

I respectfully dissent to our exercise of jurisdiction in this case, and would dismiss the appeal as moot.