NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0148n.06

No. 23-3102

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | | **FILED** |
| | | Apr 01, 2024 |
| | | KELLY L. STEPHENS, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| CHARLES GRUBER, | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Charles Gruber's supervising probation officer discovered him with six functional internet-capable cell phones, many of which had recently accessed pornographic material—a violation of the terms of Gruber's supervised release, which prohibit him from possessing internet-capable phones or accessing pornography. At his revocation hearing, Gruber testified that all the cell phones belonged to his girlfriend and that he could not access them despite every passcode's being the couple's anniversary date. Gruber's girlfriend testified to the same. The district court did not believe Gruber's and his girlfriend's testimony. On appeal, Gruber challenges as procedurally unreasonable the sentence the district court imposed for the violation of supervised release. Because the district court properly weighed the evidence and reasonably imposed Gruber's two-year sentence, we affirm.

**I.**

In 2008, Charles Gruber pleaded guilty to violating 18 U.S.C. § 2421 by attempting to transport a fourteen-year-old girl in interstate commerce—from Ohio to Pennsylvania—with the

intent that she engage in sexual activity. When communicating with her, Gruber prepared for and then executed with the victim a "slave contract" in which she agreed to become Gruber's sex slave. During their interactions, Gruber used two instant-messaging aliases: "wolfslave" and "slowride," the latter referencing a nickname Gruber used over CB radio when working as a trucker. For this crime, the district court ordered that Gruber serve a seventy-one-month-imprisonment sentence followed by fifteen years of supervised release. As conditions during his supervised release, the district court (1) prohibited Gruber from associating with minors outside the presence of the minor's parent or guardian who knows about Gruber's conviction; (2) required Gruber to participate in "an outpatient mental health program" that included "treatment for sexual deviancy"; and (3) barred Gruber from accessing a computer, internet service provider, or computer network system without the prior written permission of his probation officer. Gruber's supervised release began when his imprisonment ended on February 7, 2014.

Supervised release has not gone well for Gruber. This appeal challenges the fifth substantial violation report his probation officer submitted to the district court.[1] His first supervised-release violation occurred in December 2017 when his probation officer caught him using an unapproved internet-capable phone to discuss sex and perform sexual roleplay with fourteen-, fifteen-, sixteen-, and seventeen-year-old girls. Gruber accessed the same website he used when he committed his original offense and used a variation of "slowride" as his online alias. Gruber admitted the violations, and the district court imposed a nine-month imprisonment term followed by the continuation of his fifteen-year term of supervised release.

---

[1] Gruber's probation officer prepared ten distinct violation reports for the district court. We discuss here only the violation reports that led to further court action.

After his release, Gruber initially failed to report to his local probation office. Gruber contested this violation and instead admitted to abusing prescription drugs, which prompted his counsel to request a mental-health evaluation. After reviewing the mental-health-evaluation report, the district court found that the violation had occurred, continued Gruber's supervised release, and ordered that he participate in cognitive behavioral therapy at the direction of his probation officer.

Gruber's third violation involved his resisting the court-imposed sexual-offender treatment. Specifically, Gruber denied his ever engaging in or intending to engage in inappropriate sexual behaviors. When undergoing two polygraph examinations, Gruber gave deceptive responses and utilized countermeasures to prevent analysis of his answers. The district court determined that Gruber had admitted the violation, and so it imposed a nine-month sentence of incarceration to be followed by a renewed fifteen-year term of supervised release.

Gruber's fourth violation arose from a state-court charge for his failing to register as a sex offender. He pleaded guilty to this charge and received a two-year probationary sentence. The district court continued Gruber's supervised release.

Gruber's fifth violation proved to be the last straw for the district court. In September 2022, Adam Jones, Gruber's supervising probation officer, performed a random inspection of the hotel room in which Gruber and his girlfriend resided. After confirming that Gruber had his non-internet-capable phone, Jones noticed several phones on the nightstand next to the bed. Gruber's girlfriend claimed that all the phones belonged to her and that she did not get rid of them because she wanted to save the pictures on the phones. Jones requested that Gruber's girlfriend tell him the phones' passcodes, which for each was Gruber and his girlfriend's anniversary date. The first phone Jones unlocked contained pornographic images.

3

Jones then checked Gruber's backpack. Inside of it was another internet-capable phone. The anniversary date unlocked this phone too. Gruber claimed that this phone also belonged to his girlfriend and that he had it in his backpack only because his girlfriend had dropped it on the sidewalk when they were walking. Jones discovered that this phone had also been used to access pornographic material. So Jones decided to confiscate all phones other than the approved non-internet-capable one.

A forensic examination showed extensive pornography access and e-mail use with account names similar to what Gruber used previously. For instance, the phone discovered in Gruber's backpack had information for over 400 online accounts, many of which contained "slowride," Gruber's name, or his girlfriend's name. The phone recovered from the nightstand had accessed pornographic websites as recently as the day of the search. Like the backpack phone, it also had access to an e-mail address that was a permutation of "slowride." The forensic examination showed that the person who responded to messages on that phone identified himself as Gruber, and the phone was also used to interact with Gruber's girlfriend prior to the start of their relationship. A third phone had access to another "slowride" e-mail address, and this phone accessed the same website Gruber accessed during his original offense and first supervised-release violation using an alias that included "lonewolf." Throughout multiple conversations, Gruber frequently asked for individuals to be his sex slave.

Gruber's girlfriend claimed that all the internet-capable cell phones belonged to her. She said that she had surplus phones because the government and her cell-phone provider kept providing her with new phones when they deemed the prior ones defective. Despite using the couple's anniversary date as the phones' passcode, she claimed that Gruber could not access any of the phones. When confronted with each pornographic website the phones had accessed, she

4

claimed that each and every website visit was the result of pop-up spam. Although she claimed that she used the phones to communicate on Gruber's behalf, she denied ever talking to individuals related to the pornographic websites. She also claimed that she made all the "slowride" e-mail accounts. During cross-examination, Gruber's girlfriend admitted that she was pregnant with Gruber's child and relied on him for financial support—including for a place to live.

Gruber testified to much of the same. He said that he never used his girlfriend's phones and that they all came from the government and phone companies. He claimed that he never accessed any of the phones and did not know the phones' passcode (his anniversary date). He admitted that he continued to use "slowride" for his internet moniker continuously since his original offense. But he denied that he ever used the phones to access pornography. Even after the district court determined that Gruber violated his supervised release, Gruber used his allocution to claim that the phones all belonged to his girlfriend.

Another aspect of this supervised-release violation involved Gruber's attending the Akron Pride Festival, an event oriented toward families. Recall that Gruber's supervised-release conditions (and his sex-offender treatment) require him to avoid contact with minors without preapproval. Gruber mentioned to his mental-health-treatment provider after-the-fact that he attended the Akron Pride Festival. The treatment provider directed Gruber to report his attendance to his probation officer, but Gruber never did. To his probation officer and when testifying at the supervised-release hearing, Gruber claimed that he attended the festival only to find information about Alzheimer's disease for his girlfriend's step-grandmother. But his girlfriend said the only reason they went to the festival was to support Gruber's former coworker. When pressed by Gruber's counsel whether they had an additional reason to attend, she said that they did not. And Gruber acknowledged that he saw teenagers, families, and small children at the festival.

The district court found not credible the testimony of Gruber and his girlfriend, especially since the latter was financially dependent on Gruber and pregnant with his child. It found probable cause to believe that the violations occurred, and it determined that the preponderance of evidence showed that Gruber violated the terms of his supervised release. After recounting the leniency it had previously extended Gruber, the district court emphasized that it has never allowed Gruber to use the internet without written preapproval from his probation officer. And based on the account names and pornographic websites accessed, the district court stated that it knew that Gruber, not his girlfriend, was the one who used the internet-capable cell phones. It chastised Gruber for lying to the court with such comfort, causing it to wonder if Gruber suffered from an as-yet-undiagnosed mental-health condition. The district court listed the multiple times it believed Gruber lied: about his reason for going to the Akron Pride Festival, about possessing internet-capable devices, and about accessing sexually explicit websites, among others. And it recounted the many people Gruber lied to: his probation officer, the district court, and his attorney.

The district court noted that it needed to impress upon Gruber that his freedom is limited while on supervised release. It noted that the guidelines are "not a sufficient answer" because they are "for the average, the median defendant." Instead, it said that Gruber presented "a danger to society" because he "refuses to be deterred," "ha[s] no respect for the court," and no respect for society, as shown by how he induced his girlfriend to present false testimony. The district court exercised its discretion to vary upwards and imposed the maximum twenty-four-month term of incarceration because Gruber is "way more violent and dangerous and disrespectful of the law" than the Guidelines anticipate. While incarcerated, the district court ordered that Gruber undergo another mental-health evaluation and participate in any suggested treatment. It also extended his supervised-release term to twenty-five years, with all prior conditions reimposed—including the

6

prohibitions on interacting with minors and accessing the internet without prior approval from his probation officer.

Gruber appeals.

## II.

We review sentences imposed for supervised-release violations using "a deferential abuse-of-discretion standard." *United States v. Albaadani*, 863 F.3d 496, 504 (6th Cir. 2017) (quotation marks omitted) (quoting *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015)). The district court's "factual findings will stand unless clearly erroneous[,] and [its] legal conclusions will stand unless" appellate review "leads to a contrary conclusion." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). Even if we "might reasonably have concluded that a different sentence was appropriate," that alone "is insufficient to justify reversal of the district court." *Gall v. United States*, 552 U.S. 38, 51 (2007). Instead, we assess whether the imposed sentence itself is procedurally and substantively reasonable. *United States v. Adams*, 873 F.3d 512, 516–17 (6th Cir. 2017).

Here, Gruber's only challenge is to whether his sentence is procedurally reasonable. So we examine "the method the district court has used to reach a chosen sentence." *United States v. Price*, No. 23-3241, 2024 WL 327960, at *3 (6th Cir. Jan. 29, 2024). To impose a procedurally reasonable sentence, a district court must: (1) "properly calculate the guidelines range"; (2) "treat that range as advisory"; (3) "consider the sentencing factors in 18 U.S.C. § 3553(a)"; (4) "refrain from considering impermissible factors"; (5) "select the sentence based on facts that are not clearly erroneous"; and (6) "adequately explain why it chose the sentence." *Rayyan*, 885 F.3d at 440. An adequate explanation requires the district court to "set forth enough facts to satisfy this court that it considered the parties' arguments and had a reasoned basis for exercising its own legal decision-

making authority." *United States v. Vowell*, 516 F.3d 503, 510 (6th Cir. 2008). A sentence based on "clearly erroneous facts" is procedurally unreasonable if a defendant can show that the facts are "materially false or unreliable." *Adams*, 873 F.3d at 517 (citations omitted).

However, to preserve a procedural-reasonableness challenge, the defendant "must object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection." *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004) (internal quotation marks omitted) (quoting *United States v. LeBlanc*, 612 F.2d 1012, 1014 (6th Cir. 1980)). If a defendant fails to do so, we will "review claims of procedural unreasonableness for plain error." *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010) (citing *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc)). To satisfy the plain-error standard, a defendant must show (1) an "error" (2) "that 'was obvious or clear,'" (3) "that 'affected a defendant's substantial rights'" and (4) "that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Wallace*, 597 F.3d at 802 (citing *Vonner*, 516 F.3d at 386). This "exceptional circumstance[]" arises only when the error is "so plain" that the district court was "derelict in countenancing it." *Vonner*, 516 F.3d at 836 (citation omitted).

### III.

We first address whether Gruber properly preserved his procedural-reasonableness objection. He did. Our precedent establishes that parties preserve issues, not arguments. So "[a]n argument is not forfeited on appeal because a particular . . . strain of the argument was not raised below, as long as the issue itself was properly raised." *Mills v. Barnard*, 869 F.3d 473, 483 (6th Cir. 2017); *see also Yee v. City of Escondido*, 503 U.S. 519, 534–35 (1992) (distinguishing between claims and arguments when noting that "parties [on appeal] are not limited to the precise arguments they made below"). In other words, so long as Gruber informed the district court that it committed

the error that he appeals, the particular citations or examples he now raises do not nullify the steps he took to preserve the issue.

The record establishes that Gruber preserved his challenge to the facts underlying the district court's revocation of his supervised release. Gruber's counsel informed the district court that he intended to contest all four alleged supervised-release violations. To contest the factual basis of his supervised-release revocation, Gruber offered his own testimony as well as that of his girlfriend. Both Gruber and his girlfriend testified that the internet-capable phones belonged exclusively to his girlfriend and that Gruber could not access them. The district court found this testimony not credible and instead believed Gruber's probation officer who testified that Gruber possessed or had access to the phones. Even still, during his allocution, Gruber again insisted that the phones belonged to his girlfriend. And on appeal, Gruber presses this very issue: that the district court relied on erroneous facts because—among other reasons—the phones belonged exclusively to his girlfriend.

By consistently contesting the factual basis for his revocation, Gruber preserved his procedural-reasonableness objection. When asked for objections at the end of sentencing—a procedure we call the *Bostic* question—a defendant does not have any obligation "to raise objections already made." *Vonner*, 516 F.3d at 390. Instead, the purpose of the *Bostic* question is to elicit "objections for appeal that counsel has not yet seen fit to raise or has not yet had an opportunity to raise." *Id.* Moreover, the discussion between the district court and Gruber's counsel revealed that each understood the basis of Gruber's continuing objection. Gruber's counsel stated that he believed that "the record d[id]n't support an upward variance" or "an extension of the time of supervision." And the district court responded that "the record is replete with support for my decision." Because Gruber consistently objected to the factual basis of his supervised-release

9

revocation, we assess this issue using our deferential-abuse-of-discretion standard. *Albaadani*, 863 F.3d at 504.

Gruber challenges four "contested factual assertions." They are: (1) that Gruber lied to his attorney; (2) that Gruber went to the Akron Pride Festival to interact with teenagers; (3) that Gruber is a violent person; and (4) that Gruber has undiscovered mental-health issues. We take each of Gruber's arguments in turn.

First, the record is overflowing with information suggesting that Gruber lied to his attorney. Defense counsel cannot "create" a "bona fide defense" to a charge when none exists—to do so would be "unethical." *Sanborn v. Parker*, 629 F.3d 554, 584 (6th Cir. 2010) (quoting *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984)); *see also* AMERICAN BAR ASSOCIATION, CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ (Standard 4-7.6(b) noting that "[d]efense counsel should not knowingly offer false evidence for its truth," including by witness testimony); Ohio Prof. Cond. Rule 3.3 (prohibiting offering evidence that a lawyer knows to be false). So when Gruber's counsel elicited testimony from Gruber and his girlfriend, the district court could infer that Gruber's counsel (1) had a good-faith belief in their testimonies that (2) arose from information Gruber shared with his counsel.

The testimony provided by Gruber and his girlfriend was reasonably determined to be false. It is not believable that Gruber's girlfriend possessed seven internet-capable phones, many of which accessed pornographic material that she claimed came exclusively from spam pop-ups. As the district court explained, this excuse failed to grapple with the differences between a website popping up versus repeatedly and intentionally accessing it. Nor is it believable that Gruber could not access phones that were all secured by the same passcode—his anniversary date. In addition,

10

the phones accessed the same website through which Gruber committed his original offense—and did so using his usual alias. Based on the district court's previous experience with Gruber, it properly concluded that the false testimony meant that Gruber lied to the court, his probation officer, and his attorney.

At any rate, Gruber misstates the importance of the district court's stating that he lied to his attorney. Though regrettable and inadvisable, a defendant's lying to an attorney is not an independently relevant factor for a district court to consider when revoking supervised release. Instead, the district court highlighted this dishonesty to show that Gruber took no responsibility for violating his supervised-release conditions. So it considered Gruber's dishonesty toward his lawyer as part of "the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Esteras*, 88 F.4th 1163, 1166 (6th Cir. 2023) (citing 18 U.S.C. § 3553(a)(1)). Since district courts must consider this factor when imposing a sentence for supervised-release violations, the consideration of that factor here was not procedurally unreasonable.

Second, the district court did not abuse its discretion by surmising that Gruber attended the Akron Pride Festival to interact with or be around teenagers. Gruber and his girlfriend did not even offer consistent testimony on why they attended the event. Gruber claimed that he went to the event to locate information on Alzheimer's disease for his girlfriend's step-grandmother. But Gruber's girlfriend claimed that the *only* reason they attended it was to support Gruber's former coworker. It strains credulity to suggest that Gruber wanted to attend the event to support his girlfriend's step-grandmother yet never told her that was his reason for doing so. Instead, testimony from both Gruber and his probation officer established that Gruber saw teenagers and families who were attending the Akron Pride Festival. Before discussing this violation, the district court noted

11

that it "was open" to the argument that Gruber attended the Akron Pride Festival due to a "misapprehension" because he "just didn't understand [his] term[s] of supervision." Violation Hr'g Tr., R.111, PageID#732. But after reviewing the record and testimony, the district court concluded that Gruber's girlfriend "didn't know" that he attended the event "to check out teenagers." *Id.* at PageID#734.

The district court's inference is reasonable. Gruber has shown that he is someone who refuses to be deterred from communicating with minors regarding sexually explicit content. Given the inconsistent reasons for visiting the Akron Pride Festival given by Gruber and his girlfriend, it was logical for the district court to view Gruber's attendance there as another scheme to be around teenagers who might be interested in exploring their sexuality. This fits squarely within Congress' command for a district court, when revoking supervised release, to determine how best to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." *Esteras*, 88 F.4th at 1166 (citing 18 U.S.C. § 3553(a)(2)(B), (C)). The district court's considering this factor is a reasonable inference from the record and thus not procedurally unreasonable.

Third, Gruber's concern over the district court's describing him as a "violent" person raises a plausible argument. Gruber correctly notes that his previous supervised-release violations did not involve violence, nor is he alleged to have had any physical contact with the victim from his underlying conviction. But we think this misunderstands how the district court used the word "violent." Although "violent" often refers to physical force, it also means "[v]ehemently or passionately threatening." *Violent*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Violent*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/violent (last accessed Feb. 15, 2024) (defining "violent" as "notably forceful, furious, or vehement," and using as examples "a

12

violent argument" and "a violent denunciation" (emphasis omitted)). And there is little doubt that Gruber, because of his ongoing supervised-release violations, presents a persistent or vehement threat to the public. Even though the district court has twice revoked his supervised-release term, Gruber continues to violate the terms of his release. He continues to access pornographic material, including material relating to teenagers. He continues to use the same website through which he met his original victim, and he still uses permutations of his prior aliases. And as the government points out, Gruber's history includes his possessing pornography that is violent in nature, his entering into a "slave contract" with a minor—evocative of his "sexual niche for dominant/submissive relationships"—and his participating in char groups geared toward the sexual abuse of minors. These actions constitute a vehement threat to any minor with whom Gruber will interact, as he is undeterred by the terms of his supervised release.

In context, the district court did not abuse its discretion by describing Gruber as violent. It said that it would vary upwards because Gruber is "way more violent and dangerous and disrespectful of the law than the United States [Sentencing] Guidelines anticipates." Violation Hr'g Tr., R.111, PageID#737. Properly contextualized, the district court's description of Gruber as "violent" does not mean he is someone who has previously used physical force to achieve his aims; instead it presents him as someone who has persistently violated the law and, as such, is expected to continue to do so. The record supports this conclusion: the hearing concerned the fifth notable time that Gruber violated his supervised release conditions. And Gruber used the same internet alias that he used when committing his underlying offense and accessed the same pornographic websites that he used before. Because district courts may consider the need to afford adequate deterrence and to protect the public from further crimes, considering Gruber's insistent violations

13

of supervised release is entirely reasonable. *See Esteras*, 88 F.4th at 1166 (citing 18 U.S.C. § 3553(a)(2)(B), (C)).

Finally, the district court appropriately questioned whether Gruber suffers from undiscovered mental-health issues. Congress has empowered district courts to consider the need to "'provide the defendant with . . . medical care[] or other correctional treatment in the most effective manner.'" *Id.* (citing 18 U.S.C. § 3553(a)(2)(D)). The ease with which Gruber presented false testimony to the district court led it to "wonder if there is a mental health diagnosis that we've missed." Violation Hr'g Tr., R.111, PageID#734. For that reason, the district court ordered that Gruber "undergo another mental health evaluation and the treatment that's suggested for [him] as a result." *Id.* at PageID#737. As another specifically enumerated factor for district courts to consider during supervised-release revocation, the district court's statement was procedurally reasonable.

In sum, each statement that Gruber argues made his sentence procedurally unreasonable in fact relates to a specific factor that district courts may consider when revoking supervised release, and none of the statements reflect any reliance on clearly erroneous facts. As a result, the district court's sentencing Gruber to twenty-four months of incarceration was procedurally reasonable.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.